Appeal from Third District.

## HOUGHTON *ET AL*. v. BARTON.

No. 2940. Decided May 7, 1917. (165 Pac. 471.)

1. ADVERSE POSSESSION—HOSTILE POSSESSION—SUFFICIENCY. Where J., the purchaser of the north half of a lot, took possession of a strip which he believed to be such north half and constructed a dwelling house thereon, but about the time he moved away a purchaser of the south half of the lot took actual possession of such strip, collected rent from the tenants, made substantial and valuable improvements, erected a fence, and paid all water taxes and all taxes, general and special, assessed against the land and the improvements for thirteen years, the owners of the north half being assessed with no improvements, he acquired title by adverse possession, as his conduct was not only consistent with the theory that he owned such strip, but inconsistent with the theory that his occupation was that of a trespasser or as agent of the owners of the north half. (Page 620.)

2. BOUNDARIES—EVIDENCE—WEIGHT AND SUFFICIENCY. In an action involving a dispute as to the boundary between the north and south halves of lot 2 in a block of four lots numbered from the south, which contained more land than that shown on the official plat of the city, wherein defendant, owning lot 1 and the south half of lot 2, claimed that the surplus was a part of the street bounding the block on the south as originally surveyed and platted, evidence *held* to support findings in favor of defendant's claim as to the location of the line, and to show that plaintiffs thereby received the land they bought.[1] (Page 622.)

3. MUNICIPAL CORPORATIONS—VACATION OF PORTION OF STREET—PERSONS' PREJUDICED. The city did not exceed or abuse its power to the prejudice of plaintiffs by waiving whatever title or right it had to such surplus. (Page 624.)

4. COSTS—STATUTORY PROVISIONS—STRICT CONSTRUCTION. As costs were not recoverable at common law and the right to costs is purely statutory, statutes authorizing them are strictly construed.[2] (Page 625.)

5. COSTS—COST BILL—TIME FOR FILING AND SERVING. Under Comp.

---

[1] *Leland* v. *Bourne*, 41 Utah 125, 125 Pac. 652; *Moyer* v. *Langton*, 37 Utah 9, 106 Pac. 508; *Young* v. *Hyland*, 37 Utah 229, 108 Pac. 1124; *Binford* v. *Eccles*, 41 Utah 453, 126 Pac. 333.

[2] *Smith* v. *Alford*, 31 Utah 346, 88 Pac. 16.

Laws 1907, Sec. 3350, providing that the party in whose favor judgment is rendered ánd who claims his costs must deliver to the clerk and serve upon the adverse party within five days after the verdict or notice of decision of the court or referee a memorandum of the items of his costs and necessary disbursements, the filing and service of the cost bill before the entry of the finding and decree was not a substantial compliance with the statute, and the cost bill should have been stricken.[1]  (Page 626.)

Appeal from District Court, Third District; Hon. *T. D. Lewis*, Judge.

Action by John A. Houghton and others against Lester U. Barton.

Judgment for defendant.  Plaintiffs appeal.

AFFIRMED and remanded, with directions to modify.

*Booth, Lee, Badger & Rich* and *I. B. Evans* for appellants.

*Stokes & Bagley* for respondent.

## STATEMENT OF FACTS.

This is an action to quiet title to a portion of lot 2, block 19, plat E, Salt Lake City survey, Utah.  Block 19, of which the land in dispute forms a part, is bounded on the south by Third North street, formerly called Plum street; on the north by Fourth North street, formerly called Peach street; on the east by Wall street; and on the west by North Main street, formerly called Oak street.  Block 19, as platted, consists of a tier of four lots.  The lots, commencing at the south end of the tier, are numbered 1, 2, 3 and 4.  According to the official plat of Salt Lake City, filed April 2, 1888, the width of each of the four lots north and south is as follows: Lot 1, 5 rods; lot 2, 7 rods; lot 3, 10 rods, and lot 4, 12 4/10 rods. It is conceded that Block 19 in a northerly and southerly direction contains approximately 52 feet of surplus ground.

---

[1]*Smith* v. *Alford*, 31 Utah 346, 88 Pac. 16.

The defendant contends that the 52 feet of surplus ground is the south end of the block and abuts on Third North street, and that the distance from the north side of the street to the north boundary line of lot 2 is approximately 250 feet. Plaintiffs, on the other hand, insist that the distance between these points is 198 feet—12 rods. And they, in effect, claim, if we correctly understand their position, that the 52 feet of surplus ground lies between the north boundary line of lot 2 and the south boundary of lot 4. That is, lot 3, which the maps and plats in evidence of block 19 show to be 10 rods only in width in a northerly and southerly direction is in fact a little in excess of 13 rods in width.

John A. Houghton, one of the plaintiffs, testified in part as follows:

"I owned the north half of lot 2, and if there was any excess up there it was either in lot 3 or we had a quitclaim deed to it. * * * I don't know where the excess is. I said I owned everything between the south half of lot 2 and 4. Where the boundaries of lot 3 are I don't know. If there is any excess in there I claim it."

Plaintiffs allege in their complaint, and in their reply to defendant's counterclaim, that they and their predecessors for more than 7 years last past have owned and possessed all of the south half of lot 2 in said block 19, described as follows:

"Commencing at a point 140.25 feet north, 28 deg. 8 min. west of the southwest corner of lot one (1) in said block, said southwest corner of said lot one (1) being 26.13 feet east and 22.5 feet north of the present monument located at the intersection of Main and Third North streets in Salt Lake City; running thence northwesterly along Main street 57.75 feet; thence east parallel with the south boundary line of lot one (1) to Wall street; thence southeasterly along Wall street to a point 57.75 feet northwesterly along said Wall street from the northeast corner of Margaret L. Taylor's land, and from the northeast corner of said lot one (1); thence west parallel with the south boundary of lot one (1) to place of beginning."

Defendant, in his answer and counterclaim, among other things, alleges that he and his predecessors, for more than

20 years next preceding the commencement of this action, have owned and have been in the actual possession of the following described property in block 19, plat E, Salt Lake City survey:

"Commencing at a point 26.13 feet east and 22.5 feet north from the present monument located at the intersection of what is called Main and Third North streets, Salt Lake City, Utah, running thence north 24 deg. 8 min. west 192.12 feet; thence east on a line parallel with the monument line on Third North street aforesaid 216.78 feet; thence south 30 deg. 11 min. east 115.60 feet to the northeast corner of Margaret L. Taylor's land; thence west along the north line of Margaret L. Taylor's land and parallel with the monument line on Third North street aforesaid 81.55 feet to the northwest corner of said Margaret L. Taylor's land; thence south 75.4 feet to the southwest corner of said Margaret L. Taylor's land; thence west and parallel with the monument line on Third North street aforesaid 114.815 feet to the place of beginning."

It is further alleged:

"That during all of said time defendant and his predecessors have occupied, cultivated, and improved said property and have subjected the same to ordinary use; that they have maintained and protected the same by substantial inclosures, and have paid all the taxes that have been levied and assessed against the same according to law; that such possession, during all of said time, has been continuous, perpetual, peaceable, and without interference or disturbance of any character, and has been open and notorious and adverse against these plaintiffs and all the world."

He also alleges that plaintiffs' cause of action is barred by the provisions of Comp. Laws 1907, section 2859, which reads as follows:

"No action for the recovery of real property, or for the possession thereof, shall be maintained, unless it appear that the plaintiff, his ancestor, grantor, or predecessor was seized or possessed of the property in question within seven years before the commencement of the action."

On the issues presented by the pleadings the trial court made the following findings of fact:

"(1) That in 1887, one Ezra Jarvis purchased and received an executed deed, transferring to said Ezra Jarvis, the north half of lot 2, block 19, plat E, Salt Lake City survey, situated in Salt Lake County, Utah; and the said Ezra Jarvis immediately took possession of certain property in said block, and believed by the said Ezra Jarvis to be the said north half of said lot and block, and upon which said Ezra Jarvis constructed a brick dwelling house consisting of two rooms.

"(2) That in about the year 1889 one Hyrum Barton entered into the possession of the following described property in Salt Lake County, Utah, to wit (describing the property above mentioned in defendant's counterclaim).

"(3) That upon the said property described, possession of which was taken by said Hyrum Barton, and near the northwest corner of the same, was situated the said brick house which was constructed by said Ezra Jarvis. That upon taking possession of the said property, including the said brick house, the said Hyrum Barton constructed fences around and inclosed the same, and that since about the year 1890 the defendant herein and his predecessor, Hyrum Barton, have been in the actual, open, undisturbed, peaceable, and notorious possession of the said property, claiming the same as owners thereof, and planted thereon rose bushes and trees, and constructed and maintained fences thereon and constructed and maintained buildings, and also the said Hyrum Barton constructed reservoirs and irrigation ditches to be used for the purpose of irrigating the vegetation on the said property; * * * and that during all of said periods, and up to the time of the trial of this action, defendant and his predecessors in interest have held continuous, perpetual, undisturbed, and peaceable possession of said property, and claim to be the owners thereof as against the plaintiffs in this action and all other persons whomsoever. * * *

"(5) That for a period of more than 7 years immediately preceding the commencement of this action the plaintiffs, nor either of them, nor their predecessors in interest, nor any of

them, at any time, have been seized or possessed, or in possession, of the said property hereinbefore described, or any part thereof.

"(6)    *    *    *

"(7)    That in the year 1899 the property whereon the said house constructed by said Ezra Jarvis was situated, and which said land is hereinbefore specifically described, and which the said Hyrum Barton was then in possession of, together with the said house, was assessed to Hyrum Barton and thereafter continuously and to and including the year 1909, the said property, together with the said house, was assessed to Hyrum Barton, and that he, the said Hyrum Barton, and his successors in interest paid the taxes on the said property for each and every year, and remained in possession thereof, claiming to be the owners thereof.

"(8)    That in the year 1901 the said Hyrum Barton died, and that thereupon this defendant, together with the other heirs of the estate, entered into and held possession of the said property, claiming the same exclusively and by right of absolute ownership in fee, and paid all taxes assessed against the same, including taxes for sewer, water tax, and general tax; and that in the year 1912 the defendant laid cement sidewalks in front of the said property, both where the same abuts on Wall street and where the same abuts on Main street.

"(9)    That the plaintiffs are owners of the north half of lot 2, block 19, plat E, Salt Lake City survey, Salt Lake County, Utah, and that the defendant is the owner and is entitled to the possession of the south half of lot 2, said block, plat, and survey, and that the dividing line between the said properties should be located as follows: Commencing at a point north 24 deg. 8 min. west 192.12 feet from the southwest corner of block 19, plat E, Salt Lake City survey as now claimed, and which said corner of block 19 is 26.13 feet east and 22.5 feet north of the present monument located at the intersection of what is known as Main and Third North streets. From said point of beginning running east 216.78 feet more or less to Wall street on a line parallel with the monument line on Third North street as now established."

The conclusions of law and the decree made and entered by

the court are responsive to, and in conformity with, the findings of fact.

To reverse the judgment plaintiffs prosecute this appeal.

McCARTY, J. (after stating the facts as above).

Numerous errors are assigned by appellants, but we do not think any of them contain sufficient merit to warrant discussion except those based on the alleged insufficiency of the evidence to sustain the findings of fact and the decree, and the assignment of error directed to the ruling of the court denying appellant's motion to strike out respondent's cost bill.

The record shows that one Margaret Thomas deraigned title through mesne conveyances to all of lot 2 from Daniel H. Wells, mayor of Salt Lake City, Utah, who obtained the patent from the United States government for the lands covered by and included within the aforesaid plat E, Salt Lake City survey. The patent of Mayor Wells bears date June 1, 1872. In the deed from Wells, and in all subsequent transactions conveying or incumbering the north half of lot 2, as shown by the abstract of title in evidence, the property is described by merely referring to it as "the north half of lot 2," etc. In fact, appellants, in their printed brief, say the "chain of title from the mayor's deed in 1873 to the deed to plaintiffs in 1909, the parcel of land here involved, is constantly designated as 'the north half of lot 2, block 19, plat E, Salt Lake City survey.' " And the same is true of the chain of title to the south half of lot 2, block 19. On June 20, 1887, Margaret Thomas conveyed to Ezra Jarvis, by warranty deed, the north half of lot 2, hereafter referred to as the Jarvis property. The evidence, without conflict, shows that at the time this deed was executed, and when Jarvis went in possession of ground in block 19 which he believed to be the land described in his deed, the south end of block 19, for a distance of 5 rods north of Third North street was inclosed by fence; that one Wahlquist was the owner of, and resided on, the land enclosed, that the balance of the ground in block 19 was vacant and unimproved, and that there were not stakes or monuments indicating the location of

lot 2 other than the fence mentioned. Solomon F. Kimball, Wahlquists's grantor, testified that he owned lots 1 and 2 in 1875 or 1876; that in 1877 he sold lot 1 to Wahlquist; that at that time there were no houses, fences, or improvements of any kind, in block 19; that he and Wahlquist located the boundaries of lot 1; that the south boundary line, as located by them, was in line with the fence on improved property on the west side of Third North street, which was opposite lot 1. He also testified in part as follows:

"I had a plat with me at that time: Lot 1 was five rods wide according to the plat. * * * In fixing (locating) the lot * * * we took no measurements at all from the north side of the property, or from the north end of block 19. We measured the south side and the west side."

On this point Wahlquist gave evidence which was substantially the same as that given by Kimball. He also testified that he erected a dwelling house on the property in 1878 and fenced it in 1879; that he erected the fence on the boundary lines as located by him and Kimball at the time he took poessession of the lot; that he resided on the property from 1878 until 1888, a period 10 years, when he disposed of it and moved away; that when he vacated the premises the fence he erected in 1879 was still there and in good condition.

Jarvis was a witness for appellants and testified in part as follows:

"We ascertained where the north half of lot 2 was located by measuring from the south line of lot 1. I measured 12 rods to the north from the southwest corner. * * * The corner was indicated by a fence which went clear around lot 1. * * * Wahlquist at that time lived on lot 1. The corner of that old fence that Wahlquist showed me as the corner of lot 1 was in the same place as it is now. * * * We measured from the southwest corner of lot 1 as the fence there indicated. We allowed 5 rods to lot 1 and then measured off 7 rods more," for lot 2.

Jarvis went in possession of the north half of lot 2 as thus located soon after the execution of the deed from Margaret Thomas to him. He erected a brick dwelling house on the property, and constructed a picket fence on what he claimed

to be the north boundary of the lot commencing at a point 198 feet (12 rods) north from the southwest corner of the block running east, and about two-thirds of the distance between North Main and Wall streets. Jarvis further testified that:

"No one was living on the south half of lot 2 while I was there. It was not inclosed, and there were no improvements on it. There were no improvements of any kind on lot 2, except what I put there. * * * All that property east and north of me was unimproved. * * * We made some measurements as to the location of the fence this morning. * * * The 12-rod measurement took us 6 feet north of the fence now standing north of my property. It is my opinion that the fence as it now stands is not on a line with the fence as I built it. It is about 7 feet further to the south than where I built it."

Jarvis, on March 31, 1888, deeded the property to Morris R. Evans, and soon thereafter vacated the premises. About the time Evans purchased the Jarvis property one Hyrum Barton purchased and moved onto lot 1, where he resided until his death, which occurred in September, 1901, a period of about 13 years. Evans was a witness for appellants, and testified that immediately after he purchased the Jarvis property in 1888 he rented it to a man by the name of Solomon. He further testified:

"If I remember correctly the Solomon rents were paid to me, but he was behind, and I just told him to get out. My impression is that he went out of the house. Later on Mr. Barton took the rents. It is possible that Mr. Barton may have collected some of the Solomon rents. I couldn't say. * * * I don't remember that I collected any after he moved out."

On July 12, 1898, the Salt Lake Valley Loan & Trust Company, a corporation, hereinafter called trust company, acquired the legal title to the north half of lot 2, and in June, 1909, the trust company, by warranty deed, conveyed the property to Houghton and Bothwell, appellants herein.

While the official map of plat E, bearing date of April 2, 1888, shows, as herein stated, block 19 to be 34 4/10 rods in

length north and south, the evidence, nevertheless, shows, eliminating this map, that the distance between Third North and Fourth North streets is, because of the surplus ground in· the block, approximately 37 5/10 rods. There are, however, plats, files, of the city engineer's office admitted in evidence, one of which bears date of June 29, 1885, that show the excess or surplus ground in the block. It also appears from the tracing on some of these maps that this excess or surplus ground was a part of Third North street as the same was originaly platted and laid out.

On February 28, 1896, Hyrum Barton acquired by deed the legal title to the south half of lot 2 in block 19. The undisputed evidence shows that Hyrum Barton, from about the time he moved onto block 19 until his death in 1901, collected rents from the different tenants who lived in the Jarvis house during that time.

Matthew W. Wilson, one of the tenants referred to, was called as a witness, and testified in part as follows:

"I knew Hyrum Barton in his lifetime. During the summer of 1897, from about * * * May until September I rented from him. * * * The house I lived in (referring to the Jarvis house) was a small two-room brick house. * * * When I rented that place I made arrangements with Hyrum Barton. * * * When I paid rent I paid it to Mr. Barton."

Hyrum Barton not only collected rents from the tenants, but he took actual possession of the Jarvis property and made substantial and valuable improvements thereon, consisting in part of a large barn, a watering trough, chicken coops, etc., all of which were erected east and southeast of the house. He also erected a board fence east of the house and extending north and south across the property between the house and the improvements mentioned. He, at his own expense, laid and maintained a pipe line connecting the house and yards with the city's water mains and supplied the house and premises with water. And the evidence shows that from the year 1901 to and including the year 1909, respondent and his predecessors in interest paid all water taxes assessed against the property. The evidence also shows that

he constructed water ditches which were used in irrigating trees and shrubbery from year to year planted on the lot by him and members of his family. During several years of this time his plural wife lived in the house. The east end of the lot was used by Barton mainly as a yard for his chickens and domestic animals, and the barn and other improvements (outbuildings about the yard) were used for watering, feeding, and sheltering them. The barn later was "turned into * * * a carpet, mattress cleaning factory," and on October 25, 1910, was destroyed by fire. We think Hyrum Barton's entire course of conduct relating to the Jarvis property from the time he acquired the legal title to the south half of lot 2, as shown by the great weight of the evidence, was not only consistent with the theory that he owned it, but was inconsistent with the theory that his occupation of the premises was that of a trespasser, or, as counsel for appellants seem to contend, as agent of Evans. In fact, the evidence is undisputed that his claim of ownership and possession of the ground in block 19, from the north side of Third North street to the fence line immediately north of the Jarvis house, was so open and notorious that the entire premises were known, and generally spoken of by his neighbors in that vicinity, as the "Barton property."

The record shows that from the time the trust company acquired title (July 12, 1898) to the north half of lot 2 until it was deeded to appellants (June 1, 1908), a period of nearly ten years, there were no houses or other improvements on block 19 north of the Jarvis property. This is important, as it tends to show by whom the taxes assessed against the Jarvis property during those years were paid. The assessment rolls of Salt Lake County for the year 1899, to and including the year 1911, show that the south half of lot 2 was assessed to Hyrum Barton. The land was assessed at $500 for each of these thirteen years, and the improvements were assessed at from $135 to $150 for each of the years to and including the year 1909. No assessment was made on improvements for the year 1910. For the year 1911 the improvements, designated "found," were assessed at $100. The evidence shows that "found," as used in the assessment rolls, means "founda-

tion." The evidence shows that in the year 1911 all that remained of the Jarvis house was the foundation and a part of the walls. During this period of time the north half of lot 2 was assessed to the trust company, and at no time during these thirteen years was the trust company assessed for improvements on any part of lot 2. We, therefore, think it clearly appears that respondent and his predecessor, Hyrum Barton, not only possessed, occupied, and claimed to own the Jarvis property during the thirteen years ending 1911, but paid all taxes, both general and special, assessed against the property during that time.

Assuming, for the sake of argument, but not conceding, that the boundary lines of lot 2 are where appellants claim them to be, few cases, if any, can be found where the facts show a more complete acquisition of title by adverse possession than that acquired and asserted by respondent in this case, as shown by the undisputed evidence.

Moreover, the undisputed evidence shows that appellants have the amount of land, the title of which is not in dispute, that their own evidence, testimony, shows they purchased in block 19; and, should they prevail in this action, they would be adjudged to be the owners of land which they at no time either purchased or possessed. Counsel for appellants seem to deny this, if we correctly understand their position. We think the maps and plats of block 19, in evidence, considered in connection with the evidence of Houghton, one of the appellants, to which we have referred, clearly show this. Furthermore, the evidence, without conflict, shows that the respondent, in the year 1911, at his own expense, laid a cement walk commencing at the southwest corner of block 19 and extending north along the west side of, and contiguous to, his property, a distance of 192.12 feet, to the point or place which the trial court found and adjudged to be the northwest corner of the south half of lot 2. From that point he further extended the cement walk north 224.92 feet, or approximately 13½ rods, to the point or place which, according to the maps and plats in evidence, the correctness of which is not questioned, is the northwest corner of lot 3.

John A. Houghton, one of the appellants, paid respondent for laying the 224.92 feet of walk.

As we have pointed out, the record shows that lot 3, as platted, is 165 feet (10 rods), and the north half of lot 2, which is south of and contiguous to lot 3, is 3½ rods in width in a northerly and southerly direction. This evidence alone accounts for all the land that appellants purchased and obtained a legal title to in block 19.

Counsel for appellants in their printed brief say that, because respondent and his predecessors in interest treated and acquiesced in the south line marked by Wahlquist's fence as the south boundary of lot 1, block 19, which was established by Kimball and Wahlquist, and which was used as a starting point by Thomas and Jarvis, he ought not now be permitted to say "that line is further north." The decisive question, however, here involved is the location of the boundary of lot 2 with reference to adjoining properties. As we have pointed out, the evidence shows that lot 2 on the north joins and is contiguous to lot 3; that not later than 1896, Hyrum Barton went into possession of all of the land in block 19 extending from Third North street north to a point on North Main street 192.12 feet from the southwest corner of the block. The only inference that can be fairly drawn from the evidence is that Hyrum Barton, when he acquired the legal title to the south half of lot 2, either continued to maintain the fence built by Jarvis north of the house, or, about that time, moved the fence and reconstructed it about 6 feet nearer the dwelling. In either event he evidently maintained the fence where he claimed the dividing line between the north half and the south half of lot 2 to be. On this point Jarvis testified in part as follows:

"My best recollection is that my fence was 12 or 14 feet north of my house. * * * I am satisfied today that this (the fence) is not built on the same line, but that it is moved 6 feet further south. This fence is not on the same line as the fence what I built in 1887."

Other witnesses testified that the fence at the present time is on the line where the fence erected by Jarvis stood. This apparent conflict in the evidence is unimportant, because the

court held that the dividing line of the north half and the south half of lot 2 is where the fence now stands. The evidence, what there is on the point, tends to show that most, if not all, of the surplus ground in block 19 was a part of Third North street as the street was originally surveyed and platted, but was never used by the public as a street highway. That is, this surplus ground was a part of the street on paper only. The more recent plats made by the city of the block show that the dimensions of lot 1 have been enlarged so as to include the excess ground.

Counsel for appellants contend that the "city could not do any such act." If not, why not? As we have pointed out the evidence, without conflict, shows that respondent and his predecessor, Hyrum Barton, for more than fifteen years (the great preponderance of the evidence shows twenty full years) claimed to be the owners, and were in the exclusive possession of the south end of block 19 (except the southeast corner of the block referred to in the pleadings as the property of Margaret Taylor from Third North street northerly 192.12 feet to a point a few feet north of the foundation of the old Jarvis house on lot 2. Moreover, the evidence shows that respondent in recent years, erected an apartment house on the ground which the evidence, what there is on the point, tends to show was formerly a part of the street as the street was originally platted by the city. There is evidence tending to show that appellant Houghton, in the year 1909, was advised that the surplus ground was contiguous to and abutted on Third North street. On this point respondent testified as follows:

"I had a conversation with Mr. Houghton regarding the improvements in 1909. * * * Mr. Houghton told me I was foolish to make improvements on these premises because I was in the street. He referred to what is designated as the Wahlquist property. I was making improvements there."

Under these circumstances we are not prepared to say that the city exceeded or abused its power to the prejudice of appellants by waiving whatever title or right it may have had to the surplus ground.

The complaint made here, stripped of all sophistry, verbi-

age, and redundancy, is the refusal of the trial court to find and adjudge that this ground, which was formerly a part of Third North street, is located in the middle of the block between lots 2 and 4, and thereby increase the dimensions of lot 3 to the extent of the area of the surplus ground, which the evidence tends to show is twelve rods south of the lot. It is too plain to admit of serious discussion that a judgment in favor of appellants would have that effect.

Counsel for appellants, in support of their contention that the court erred in holding that the dividing line between the north half and the south half of lot 2 is north of the place where the Jarvis house stood, cite and rely on the following decisions of this court: *Leland* v. *Bourne,* 41 Utah 125, 125 Pac. 652; *Moyer* v. *Langton,* 37 Utah 9, 106 Pac. 508; *Young* v. *Hyland,* 37 Utah 229, 108 Pac. 1124; *Binford* v. *Eccles,* 41 Utah 453, 126 Pac. 333. We think the doctrine announced in those cases, in so far as it is applicable to the facts of this case, supports the findings and judgment of the trial court. As we have pointed out, the evidence, without any substantial conflict, shows that respondent and his predecessor, Hyrum Barton, have been in open and undisturbed possession of the Jarvis property for approximately twenty-five years next preceding the commencement of this action, and during more than fifteen years of that time, maintained a fence, or the remnants of a fence, commencing at a point 192.12 feet northerly from the southwest corner of the block to a point about six feet north of the Jarvis house, and extending east along the northern boundary line of the Jarvis property for about eighty feet.

The court's findings of fact and conclusions of law and decree were filed and entered December 1, 1915. Respondent filed his cost bill November 23, 1915, eight days before the finding and decree were entered. Appellants moved the court to strike the cost bill on the ground that it was prematurely filed and served. The court denied the motion. The order of the court denying the motion is assigned as error.

Costs were not recoverable, in fact were unknown at common law. The right, therefore, to tax and recover costs in an action or proceeding is purely satutory. 11 Cyc.          4

24; 5 Ency. Pl. & Pr. 108; 7 R. C. L. 781; 2 Words and Phrases, 1633; *Price et al.* v. *Garland,* 5 N. M. 98, 20 Pac. 182; *Smith* v. *Alford,* 31 Utah 346, 88 Pac. 16. Costs being unknown at common law, statutes authorizing them are strictly construed. *Chapin* v. *Broder,* 16 Cal. 403; *Bell* v. *Superior Court,* 150 Cal. 31, 87 Pac. 1031; *Sellick* v. *De Carlow,* 95 Cal. 644, 30 Pac. 795; *State* v. *District Court,* 33 Mont. 531, 85 Pac. 367; 7 R. C. L. 782; 5 Ency. Pl. & Pr. 111.

Comp. Laws 1907, section 3350, provides:

''The party in whose favor judgment is rendered, and who claims his costs, must deliver to the clerk, and serve a copy upon the adverse party, within five days after the verdict or notice of the decision of the court or referee, or, if the entry of the judgment on the verdict or decision be stayed, then before such entry is made, a memorandum of the items of his costs and necessary disbursements in the action or proceeding.''

The statutes of California (Fairall's Code of Civ. Proc. section 1033) and also the Montana statutes (section 7170, Code Civ. Proc. 1907), providing for the recovery of costs in civil actions, and the provisions of the Utah statute herein set forth, are identical. In *Chapin* v. *Broder, supra,* the Supreme Court of California says:

"The recovery of costs is a matter regulated exclusively by statute, and the mode pointed out for that purpose must be strictly pursued."

In the case of *Sellick* v. *De Carlow,* above cited, the cost bill was filed four days before the decision, and the California court, in that case, held that the trial court erred in denying a motion to strike out the cost bill. The Supreme Court of Montana, in the case of *State* v. *District Court,* 33 Mont. 533, 85 Pac. 368, says:

"Costs, as costs, are allowed only by statute, and can be collected only by the method pointed out by the statute (citing authorities). When, therefore, the party claiming costs has failed to claim them as directed by the statute, his right to them has not attached, and the court has no other power in the premises than to strike out and disallow them on motion of the adverse party."

This doctrine is approved by this court in the case of *Smith* v. *Alford, supra.* In that case the present Chief Justice, speaking for the court, says:

"Costs are a creature of the statute merely, and the Legislature, who alone has the power to grant them, may likewise impose the conditions upon which they are to be allowed."

One of the conditions imposed by statute in this state in cases of this kind where the entry of the judgment is not stayed is that the cost bill "must be delivered to the clerk" and a copy served "upon the adverse party within five days after the * * * notice of the decision of the court." In the case at bar this was not done, but, on the contrary, the cost bill was filed and served, as stated, eight days before there was a decision or judgment in the case. This was not a compliance, or a substantial compliance, with the requirements of the statute. The trial court, therefore, erred in denying the motion to strike out the cost bill.

For the reasons stated, the judgment is affirmed on the merits. The cause, however, is remanded, with directions to the lower court to modify the judgment by disallowing the costs taxed by respondent. Each party to pay his own cost on this appeal.

CORFMAN, J., concurs.

FRICK, C. J. (concurring).

Appellants' counsel vigorously assail the findings of fact, and insist that they are not supported by the evidence. They further contend that, in view that this is an equity case in which we have the power to make or direct findings, we, in view of all the evidence, should make or direct findings in favor of appellants. Speaking for myself, I must concede that the evidence in this case, on some of the questions involved, is not conclusive either way. The rule in this jurisdiction is, however, firmly established that every presumption is in favor of the findings and judgment, and in equity cases as in law cases that presumption prevails until it is overcome by something appearing to the contrary in the record of the proceedings brought to this court. In other words, the bur-

den of showing that the findings and judgment are wrong, rests upon the appellant, and unless he makes it appear with reasonable clearness that the findings and judgment are wrong, or against law, he must fail. As pointed out by Mr. Justice McCarty in this case, what the result should be largely turns upon the question of to which of the parties should be awarded the surplus ground contained in block 19. While, as I said before, the evidence is not conclusive, yet I think the respondent's evidence is more in accord with the court's findings and judgment, and hence the conclusion reached by my Associates is right. I, therefore, concur.